# COURT OF OYER AND TERMINER.

———•———

THE STATE *v.* DANIEL MILLER (alias DANIEL REDDEN), GEORGE HENRY HUTT, JULIA HUTT and JAMES JOHNSON.

*Murder—Evidence of Guilt—Confessions—Accomplices—Expert Witnesses.*

Where a homicide has been committed, all the parties who were aiding and assisting in the assault are equally guilty with the one who inflicted the fatal wounds.

Every man is presumed to intend the ordinary and natural consequences of his own acts. And where the killing is shown, unaccompanied by circumstances of justification, excuse or mitigation, malice is presumed and the offence is murder.

A jury ought not to convict of murder unless the dead body be seen and identified, or unless the circumstances be such as to leave no reasonable doubt of the fact.

As this court has heretofore announced, the established rule on the subject is this: Where the evidence is circumstantial, the jury must be fully satisfied, not only that the circumstances proved are consistent with the prisoner's having committed the act charged as constituting the crime, but they must also be likewise satisfied that the facts are such as to be inconsistent with any other rational conclusion than that the prisoner was the guilty party.

Whenever the guilt of the prisoner appears to the jury to be doubtful, the absence of any testimony in proof of a motive for the commission of the crime charged is a circumstance which the jury may consider in favor of the prisoner's innocence; but where the proof of guilt is satisfactory to the jury the absence of proof of motive is immaterial.

Evidence of confessions of guilt made by the prisoner must be received with great caution by the jury, and may be accepted or rejected, in part or in *toto* by the jury, as any other evidence.

The testimony of expert witnesses as to blood stains ascertained by chemical or micro-

scopic examination, must be received with great caution in homicidal cases, and valued according to the learning and skill of the expert and the nature of the investigation, and be received or rejected as any other testimony.

The testimony of detectives, police officers and relatives of accused persons should be cautiously scrutinized and carefully viewed in connection with all the circumstances proven.

*(New Castle, May 31, 1892.)*

INDICTMENT for murder ot the first degree, for the felonious killing of one Noah Benson, a colored man, living at Delaware City in said County. whose headless body was taken from the basin of the Delaware and Chesapeake Canal at that place on the morning of December 26, 1891.

The facts proved at the trial show that the deceased when last seen alive was in the company of the defendants on the evening of Thanksgiving Day, 1891, going in the direction of the house of George Henry Hutt and about a square therefrom ; that one of the defendants, Daniel Miller, on Friday following Thanksgiving Day came to the house of a witness wearing a thin gauze shirt, and when asked why he was so dressed, said : " I was in that mob Thursday night and they cut my shirt, and it was so bloody, I pulled it off and threw it away."   When asked if he had cut anybody, Miller made no reply ; but afterwards asked for three matches and the privilege of going up stairs.   When this was refused, "he commenced walking the floor and cursing and his talk was about ' cutting the damned nigger to death.' "   That certain bloody linen was found in the house of George Henry Hutt, in said town, consisting of a pillow case, waistband of drawers, etc.; and that blood was found upon the shirt of the defendant Johnson after he was arrested—all of which blood stains after being subjected to microscopic examination and measurement by the celebrated expert upon that subject, Dr. Henry F. Formad of Philadelphia, were pronounced by him to be consistent with human blood.   A broad-bladed pocket knife, apparently bloody, and about eight inches long was also found in the Hutt domicile.   A button found upon said

waistband of drawers was identified by a witness as one which she had given the deceased to sew upon his said garment.

Dr. Joseph R. Smith, the physician who examined the body at the time of its discovery, testified that there was a wound found above the right nipple pointing up under the arm into the shoulder joint, severing the auxillary artery, which wound was, in his opinion, sufficient to produce death, and that from the appearance of the trunk, the head might have been severed by an ordinary meat axe; that deceased, in his opinion, did not come to his death by drowning, for the reason that his lungs were not filled with water, which would have been the case had he died from this cause.

The body found in the canal was identified as that of Benson by a number of witnesses who testified that it was about the same size as Benson's body, full-chested and well developed like his.

Certain conversations of the defendants soon after arrest overheard by an "Every Evening" reporter, were testified to by him as tending to show guilty knowledge of the crime.

The defence was an alibi; and testimony was adduced in explanation of the manner in which the garments in question became bloody, tending to show that it had no connection with the crime in question.

At the conclusion of the State's testimony, Cooper, for defendants, moved that the Court instruct the jury to bring in a verdict of not guilty upon two grounds: contending first, that the *corpus delicti* had not been proved; and second, that there had been a failure to prove venue—that there was no proof that deceased was killed in this State or in New Castle County.

GRUBB, J: In regard to whether there is sufficient evidence of the *corpus delicti* to go before the jury; viz., that Noah Benson is dead and that his death was criminally caused, prior to the date laid in this indictment, or on or about the 26th of November, 1891,—the Court are unanimously of the opinion that we should leave that to the jury to decide, upon all the evidence before them.

As to the question of venue, the State is bound to show to the

jury either by direct testimony or by testimony from which the jury may infer it beyond a reasonable doubt, that the crime was committed in this County. At this stage of the case you ask the Court to say from the circumstances already before the jury, that there is not sufficient evidence of the venue to allow this case to go to the jury. A majority of the Court think that this should be decided by the jury and not by the Court, and therefore decline to take the question of venue from the jury. It is for them to say whether the circumstances in this case are sufficient to show that the crime was committed, in New Castle County.

HOUSTON, J: concurred in the decision.

CULLEN, J: I think venue is a material allegation and must be proved. The jury have nothing to do with it. As to the *corpus delicti*, I think it ought to go to the jury, because there is testimony here upon which the jury may act.

*John R. Nicholson*, Attorney General, and *Branch H. Giles*, Deputy Attorney General, for the State.

*Peter L. Cooper, Jr.*, for the prisoner.

GRUBB, J., charging the jury:

*Gentlemen of the Jury*: In this indictment Daniel Miller, alias Daniel Redden, George Henry Hutt, Julia Hutt and James Johnson, the prisoners at the bar, stand charged with murder of the first degree for the felonious killing with express malice aforethought of Noah Benson in the month of November, 1891, at Red Lion Hundred within this County. The first and second counts in this indictment charged that an assault upon Noah Benson was feloniously made by all four of the said prisoners but that the death of the said Benson was caused by mortal wounds inflicted by the said Miller, by the means and in the manner described therein, whilst the other three said prisoners were aiding and abetting the said Miller, as his accomplices, in committing the

said felonious assault.   The last count in the indictment charges, however, that an assault upon Benson was feloniously made by all of the said prisoners and that the death of Benson was caused by mortal wounds inflicted by all four of them in some unknown manner and by some unknown means, instruments and weapons.

But although said first and second counts allege that Miller inflicted the fatal wounds and that the other three prisoners were his accomplices in the alleged homicide, yet if the jury is satisfied that any one of them inflicted said wounds, it is sufficient for the conviction of all the parties who were aiding and assisting in the assault upon Benson, the one who actually inflicted them ; because, in contemplation of law, it became the act of each and all of those who were engaged and participating in the perpetration of the crime then committed.

Under any indictment for murder of the first degree, the jury may find the accused guilty of either murder of the first or second degree, or of manslaughter, according as the law and the evidence may warrant, but unless they shall find the accused guilty of one of these three grades of homicide, they must acquit him and render a general verdict of not guilty.   It therefore becomes necessary for the jury, in the present instance, to be sufficiently informed by the Court as to the definition and nature of murder and the distinction between the two degrees thereof, as well as to the differences between these and the inferior grades of homicide.

Homicide is the killing of any human creature and is of three kinds ; justifiable, excusable and felonious.   The taking of human life is held to be justifiable when done in the execution of public justice, as where the proper public officer duly executes a criminal under lawful sentence of death.   It is also justifiable when done in the advancement of public justice, or for the prevention of any atrocious crime attempted to be committed with force, of which examples need not here be given.   Excusable homicide is that which is committed either by misadventure or in self-defence.   Homicide by misadventure is the accidental killing of another where the

slayer is doing a lawful act unaccompanied by any criminally care-less or reckless conduct. Homicide in self-defence is where one is assaulted upon sudden affray, and, in defence of his person, where certain and immediate suffering would be the consequence of wait-ing for the assistance of the law, and there is no other probable means of escape, he kills his assailant.

In the case now before you, the marks of mortal violence upon the alleged corpse of Benson, if you believe the witnesses thereto, show an unlawful killing, and there is no evidence showing any ground for the plea of self-defence,—much less of justification. Therefore you cannot lawfully find that this is a case of either justifiable or excusable homicide.

Is it, then, a case of felonious homicide?

Felonious homicide at common law is of two kinds: namely, manslaughter and murder; the difference between which consists principally in this, that in murder there is the ingredient of malice, whilst in manslaughter there is none; for manslaughter, when voluntary, arises from the sudden heat of the passions, but murder from the wickedness and malignity of the heart. Therefore man-slaughter is defined to be the unlawful killing of another without malice either express or implied, and with-out premeditation. Manslaughter is either voluntary or involuntary voluntary manslaughter is where one kills another in the heat of blood, and this usually arises from fighting or from provocation. Involuntary manslaughter is where one, in doing an unlawful act, not felonious nor tending to great bodily harm, or in doing a lawful act without proper caution or requisite skill, undesignedly kills another. You will see at once that this is not a case of voluntary manslaughter, because there is no evidence whatsoever of any provocation or heat of blood at the time of the killing of the deceased. Nor is it one of involuntary manslaughter, because the evidence of mortal violence upon the alleged corpse of Benson, if you believe it, discloses that the slayer was doing an un-lawful act tending not only to great bodily harm to the deceased, but to produce his death.

If, therefore, you cannot lawfully render a verdict of manslaughter, it will be necessary for you to determine whether the killing of Benson—in case you shall find that he is actually dead—is murder.

Murder, which is one of the two kinds of felonious homicide —manslaughter being the other—is where a person of sound memory and discretion, unlawfully kills any reasonable creature in being, under the peace of the State, with malice aforethought either express or implied. The chief characteristic of this crime, distinguishing it from manslaughter and every other kind of homicide, and therefore indispensibly necessary to be proved, is malice prepense or aforethought. This term, malice, is not restricted to spite or malevolence towards the deceased in particular, but in its legal sense, it is understood to mean that general malignity and recklessness of the lives and personal safety of others which proceed from a heart void of a just sense of social duty and fatally bent on mischief. Malice is implied by law from every deliberate cruel act committed by one person against another, no matter how sudden such act may be. For the law considers that he who does a cruel act voluntarily, does it maliciously. And whenever the act, from which the death ensues, is committed deliberately, the law presumes that it was done in malice; and it is incumbent upon the prisoner to show from evidence, or by inference from the circumstances of the case, that the offence is of a mitigated character and does not amount to murder.

Under the Statute Laws of this State there are two degrees of murder; namely, murder of the first and murder of the second degree. The first is where the crime of murder is committed with express malice aforethought, or in perpetrating or attempting to perpetrate any crime punishable with death, and the second degree is where the crime of murder is committed otherwise, and with malice aforethought implied by law. Express malice is proved by evidence of a deliberately formed design to kill another; and such design may be shown from the circumstances attending the act, such

as the deliberate selection and use of a deadly weapon knowing it to be such ; a preconcerted hostile meeting mutually agreed on or notified and threatened by the prisoner; privily lying in wait; a previous quarrel or grudge ; antecedent menaces ; the preparation of poison or other means of doing great bodily harm to the deceased ; or any other circumstances evidencing such deliberately formed design to kill another. Implied or constructive malice is an inference or conclusion of law from the facts found by the jury ; and among these, the actual intention of the prisoner becomes an important and material fact, for though he may not have intended to take away life, or to do any personal harm, yet he may have been engaged in the perpetration of some other felonious or unlawful act from which the law raises the presumption of malice. It is the difference between express and implied or constructive malice aforethought which distiugnishes murder of the first from murder of the second degree, except, however, that under our statute, murder of the first degree may be committed when the malicious killing is done in perpetrating or ²attempting to perpetrate any crime punishable with death—as rape or arson is in this State—although from such a felonious act malice is merely implied or presumed by law. Therefore murder of the second degree is held to be proved where it is not satisfactorily shown by the evidence submitted to the jury that the killing was done with a deliberately formed design to take life, or in perpetrating or attempting to perpetrate any crime punishable with death, but is so shown that it was done suddenly, without justification or excuse, and without any provocation, or without provocation sufficient to reduce the homicide to the grade of manslaughter; or was done in perpetrating or attempting to perpetrate a felony (not capitally punishable) or any unlawful act of violence from which the law raises the presumption of malice.

Having thus instructed you as to murder of the first and second degree and the lesser grades of homicide, for your proper guidance in determining the guilt or innocence of the prisoners whom you have in charge, it is also proper to remind you that, as

the law presumes every accused person to be innocent until he is proven guilty, the burden is upon the prosecution to prove beyond a reasonable doubt, by competent evidence, every essential ingredient of the crime charged in this indictment, before the prisoners can be found guilty thereof. But on the other hand, every sane man is presumed to intend that which is the ordinary and natural consequences of his own wilful act. Therefore, on the charge of murder where the fact of killing as charged in the indictment is shown by the prosecution, unaccompanied by circumstances of justification, excuse or mitigation, the law presumes that the homicide was committed with malice, and hence amounts to murder, until the contrary is shown, and consequently the burden is thereupon thrown upon the accused of disproving the malice and showing evidence to the satisfaction of the jury that the killing was not malicious, but was either justifiable or excusable homicide, or else manslaughter.

But, for the reasons already stated, you cannot in this instance lawfully find that the killing of Benson—if you find that he has been killed—is either justifiable or excusable homicide, or manslaughter. So that if, after a careful review of all the testimony before you, you shall be satisfied that the slayer of Benson—if he has been slain—is guilty of a higher grade of homicide than manslaughter, it will then be your duty to determine from the evidence, whether the prisoners, or any of them, are guilty in manner and form as they stand indicted—that is, of murder of the first degree, —or are guilty only of murder of the second degree.

In considering the evidence with a view to determining this question, you must be guided by the legal definition and nature of these two degrees of murder, and bear in mind the distinction between malice aforethought express and malice aforethought implied, as these have just been defined to you. And here it is necessary also to inform you that, although where the fact of killing as charged in the indictment is shown by the prosecution, unaccompanied by circumstances of justification, excuse, or extenuation, the law presumes that the homicide was committed with malice until the con-

trary appears from the evidence produced at the trial, yet it goes no further than to imply malice, and therefore the legal presumption goes no further in such a case than that the killing is murder of the second degree under our statute. Wherefore, before a verdict by the jury of murder of the first degree can be lawfully rendered, it must be shown by the prosecution that the prisoners, or some of them killed or participated in the killing of Benson—if he be dead—with a sedate, deliberate purpose and formed design to take life. Such deliberate purpose and formed design may exist only for a moment, but it must be shown by the facts and circumstances attending the homicide to actually exist in order to prove that express malice aforethought without the evidence of which a conviction of murder of the first degree cannot be secured.

But before the prisoners can be found guilty of murder of either degree, under this indictment, it is imperatively incumbent on the prosecution to prove to you, beyond a reasonable doubt, first, that Noah Benson died on or about November 26, 1891, or within a year thereafter and before the finding of this indictment; second, that his death was caused by the means and in the manner described in this indictment and within this County; and third, that the prisoners at the bar or one or more of them committed, or aided and participated in the commission of the fatal act as alleged therein. In the absence of direct or positive evidence, each of these essential ingredients of the crime may be established by circumstantial evidence alone. In cases of homicide it is essential that the *corpus delicti* must be proved. That is, it must be shown both that the deceased is dead and that his death was criminally caused. Unless the *corpus delicti* in both these respects is otherwise proved, a confession is not by itself enough to sustain a conviction: nor is evidence of other statements or conduct of the accused exhibiting satisfactory indications of guilt. The sudden disappearance of a man, without apparent cause, and the failure to find him or any trace of him after diligent search, although they may have a strong suspicion that he has come to an untimely end, yet they are not

alone sufficient proof of his death, because it may be accounted for on the hypothesis that he may have absconded, or be kidnapped and concealed, and be still alive. But if his dead body be found, it is a fact in its nature conclusive. It is the general rule that a jury ought not to convict in a case of homicide unless the dead body be seen and identified. The most positive and satisfactory evidence of the fact of death is the testimony of those who were present when it happened; or who having been personally acquainted with the deceased in his life-time, have seen and recognized his body after life was extinct. But though it is necessary that the body of the deceased be satisfactorily identified, it is not necessary that this be proved by direct and positive evidence, if the circumstances be such as to leave no reasonable doubt of the fact. Where only the mutilated or decomposed remains have been found, it ought to be clearly and satisfactorily shown that they are the remains of a human being, and of one answering to the sex, age, color, size, figure or other description of the alleged deceased. Identification may also be aided by circumstances,—as by dress, articles found upon the remains, peculiar physical marks or scars, wounds, etc., similar to those known to have been upon the alleged victim of the homicide. In regard to the alleged death of Noah Benson you have the testimony of Mrs. Beck and her son, who lived on the farm two miles from Delaware City, where Benson was employed, and who say that he was there alive between 5 and 6 o'clock on Monday afternoon, November 26th, last; and also the testimony of witnesses who saw him alive the same evening on Clinton street in Delaware City in this County. You have also the testimony of other witnesses who say that they afterwards saw, on the morning of December 26th last, in Delaware City, a headless corpse of a colored man, which they, with other witnesses, identify and recognize, for the reasons stated by them, as the dead body of Noah Benson. It is for the jury to determine, from all the evidence before you, whether or not the death of Benson has been established beyond a reasonable doubt. If you find that it has been

so established, then it will be necessary for you, in the next place, to ascertain whether or not it has been satisfactorily proved that Benson's death was caused by the means and in the manner described in his indictment. It is alleged in the indictment that his death was caused by mortal wounds inflicted by striking, stabbing, cutting, etc., upon his right breast, and also by mortal wounds inflicted in some unknown manner and by some unknown means. One of the physicians who made a post-mortem examination of the alleged corpse of Benson testified that one of the wounds in the breast severed the axillary artery and was sufficient, in his judgment, to cause his death: and that such a wound might have been cut with a knife similar to the one produced in evidence. Both of the post-mortem physicians declared that there was no water in either the lungs or stomach of the said corpse, and that, in their judgment, life was extinct before it was submerged in the water and therefore it was not the body of a drowned person. Dr. Formad also positively concurred in this opinion. It was also testified that the head had been severed from the body, that the back was broken asunder and that a leg and knee were fractured.

It is for the jury to determine, from all the evidence in the case, whether Noah Benson came to his death—if you believe said body to be Benson's—by suicide, by accident, or by the unlawful act of another person or persons. If you shall be satisfied from the evidence before you, that his death was criminally caused as alleged in the indictment, and by the said wound upon the breast, or by any of the other injuries found upon said body, then, the *corpus delicti* having been established, it will be your further duty to determine whether or not the prisoners, or one or more of them, are the persons who criminally caused the death of Benson as alleged in the indictment, and within this County. This is the question of paramount interest which you must determine by the evidence and answer by your verdict.

The prosecution contends that the prisoners are the persons who, as principals or accomplices, caused the death of Benson.

This the prisoners deny, and endeavor, respectively, to prove an alibi and other circumstances to disprove the testimony and contention of the State. So far as the testimony discloses, none but the perpetrators saw when, where, how or by whom this shocking homicide was committed. Consequently the case against the prisoners cannot be proved by direct and positive testimony, but rests solely upon what is termed circumstantial evidence.

As you are aware, gentlemen, the fact in controversy to be proved in any trial will generally be attested by those who speak of their own actual and personal knowledge of its existence ; or else it is to be inferred from other facts, satisfactorily proved. In the former case, the proof rests upon our faith in the veracity, impartiality, opportunity for observation, accuracy of memory, etc. of those who speak of their own personal knowledge. In the latter case, it rests on the same grounds, with the addition of the experience and connection between the collateral facts thus proved and the fact in controversy. In the former case, the proof applies immediately to the factum probendum, without any intervening process, and it is therefore called direct or positive testimony. In the latter case, as the proof applies immediately to collateral facts, supposed to have a connection, near or remote, with the fact in controversy, it is termed circumstantial, and sometimes presumptive evidence ; and it is from such facts, if unexplained by the prisoner where guilt is charged, that the jury may, or may not, deduce or infer, or presume his guilt according as they are satisfied, or not, of the natural connection between similar facts, and the guilt of the person thus connected with them.

Circumstantial evidence is receivable in both civil and criminal trials. As crime is usually committed secretly, and often by crafty, professional criminals, its use in criminal trials is even more necessary than in civil suits. For, if excluded by courts in criminal trials, the great majority of criminals, and especially the most skillful and dangerous ones, would escape punishment, and society would then be deprived of adequate protection.

Circumstantial evidence is adopted the more readily on the one hand, in proportion to the difficulty in proving the fact by direct evidence, and, on the other, because of the general ease with which it can be disproved, or with which other facts can be proved which are inconsistent with it, if it never really occurred. But you must nevertheless remember, and most positively, that circumstantial evidence, to warrant a conviction, must be entirely satisfactory and of such significance, consistency and force as to produce conviction in the minds of the jury of the guilt of the accused beyond a reasonable doubt.

Proof beyond a reasonable doubt does not mean that the guilt of the accused, or any other fact, shall be established with the absolute certainty of a mathematical demonstration. Matters of facts are required to be proved merely to a moral certainty. To require more in dealing with human conduct and the ordinary affairs of life would be impracticable and therefore unreasonable. It is sufficient that any disputed fact relating to these shall be established by that amount of competent or appropriate evidence which ordinarily satisfies an unprejudiced mind beyond a reasonable doubt. The circumstances which will amount to this degree of proof can never be previously defined. The only legal test of which they are susceptible is their sufficiency to satisfy the mind and conscience of a man of common sense and ordinary discretion, and so to convince him that he would act upon that conviction in matters of the highest concern and importance to his own interest.

Reasonable doubt, in the legal sense, therefore does not mean a vague, speculative or whimsical doubt or uncertainty—nor a merely possible doubt of the truth of the fact to be proved.

In civil cases it is the duty of the jury to decide in favor of the party on whose side the weight of evidence preponderates, and according to the apparent probability of truth; but in criminal cases because of the graver consequences of a wrong decision, the jurors are required to be satisfied beyond a reasonable doubt, of the guilt of the accused, or it is their duty to acquit him. In civil cases it

is sufficient if the evidence in the aggregate agrees with and sup-
ports the hypothesis which it is adduced to prove; but in criminal
cases, it must be such as to produce a moral certainty of guilt and
to exclude any other reasonable hypothesis, but that of the guilt of
the accused. In both cases a verdict may well be founded on cir-
cumstances alone; and these often lead to a conclusion more satis-
factory that that produced by direct evidence.

In this connection we will briefly refer to the law in respect to
the proof of motive in criminal cases. Whenever, upon the general
evidence, the imputed guilt of the prisoner appears to the jury to
be doubtful, the absence of any testimony in proof of a motive for
the commission of the crime charged, is a circumstance which the
jury may consider, in connection with all the other evidence in the
case, in favor of the prisoner's innocence. But whenever upon the
general evidence, the jury are satisfied, beyond a reasonable doubt,
of the guilt of the accused, notwithstanding the absence of any
testimony in proof of such a motive, then, in that case, his guilt
being already proved, such absence thereof is manifestly immaterial;
for if actually proved, in such a case it could merely operate as cor-
roborative evidence.

We will also refer briefly to confessions of guilt in criminal
prosecutions. These are either direct confessions, or confessions in-
ferred from the conduct, etc., of the prisoner, and termed indirect
confessions of guilt. The evidence of verbal confessions of guilt is
to be received with great caution, for besides the danger of mistake,
from the misapprehension of the witnesses, the misuse of words,
the failure of the party to express his own meaning, and the in-
firmity of memory. It should be recollected that the mind of the
prisoner himself is oppressed by the calamity of his situation and
that he is sometimes influenced by motives of hope or fear to make
an untrue confession. The degree of credit due to them is to be es-
timated by the jury under the circumstances of each case. The
whole of what the prisoner said on the subject at the time
time of making the confession should be taken together. The jury

may believe that part which criminates the prisoner, and reject that which is in his favor, or vice versa, if they see sufficient grounds for so doing; for the jury are at liberty to judge of it like other evidence, from all the circumstances of the case.

During the progress of this trial, Dr. Formad and Dr. Davis having testified as scientific experts in the case as to whether or not certain stains upon the drawers band, undershirt, towel, Johnson's shirt and other articles produced before you, contained normal human blood, or, on the contrary, hog blood and menstruous blood, we are called upon to instruct you in regard to the consideration which you are to give to their testimony. Persons accustomed to make chemical and microscopic examination of blood and blood stains, are allowed to testify whether human blood can be distinguished from animal blood, and, if so, whether a particular blood stain was made by human or animal blood. Such evidence has been received in numerous cases, and without any objection. The controversy is not over the admissibility of such testimony, but has been as to the possibility of distiguishing human from animal blood. The possibility of so doing has been asserted on the one hand and denied, to a certain extent at least, on the other. Therefore, although of late far greater exactness and certainty in the examination of blood and blood stains has been attained than in former years, yet we deem it proper to say to you that the testimony of all such experts is to be received and weighed by the jury with great caution in homicide trials. The value of expert testimony depends on the learning and skill of the expert, and on the nature of the subject of investigation. The value of the testimony varies with the circumstances of each case; and of those circumstances the jury must be the judges. They should take into consideration the expert's means of knowledge and the reasons he assigns for the opinion he has given, and give or withhold credence to his testimony, as they may find his qualifications sufficient, and his reasons satisfactory, or otherwise. Upon the jury rests the responsibility of rendering a verdict, and if the testimony of any ex-

pert is opposed to the jury's convictions of truth, it is their right and duty to disregard it. The testimony of experts is to be considered like any other testimony, and is to be tried by the same tests, and receive just so much weight and credit as the jury may deem it entitled to, viewed in connection with all the evidence in the case.

And here it may be remarked that the testimony of the detectives, police officers and relatives of accused persons is to be considered in like manner and be cautiously scrutinized and carefully viewed in connection with all the circumstances proven.

In this case the prisoners Miller and Johnson have attempted to prove the defence of alibi—that is, that each of them were elsewhere and did not commit or participate in the commission of the crime charged against them. In considering the strength of the evidence necessary to sustain this defence, it is obvious that all testimony tending to show that the accused was in another place at the time of the offence, is in direct conflict with that which tends to prove that he was at that place where the crime was committed, and actually committed it. In this conflict of evidence, whatever tends to support the one, tends in the same degree to rebut and overthrow the other ; and it is for the jury to decide where the truth lies. Since this defence is liable both to honest mistake and deliberate fabrication, it must be remembered that the testimony in support of an alibi is to be subjected to a careful scrutiny, both as to the sufficiency of the evidence and the inference to be drawn from the facts, if fully proved. As already stated, the burden is upon the prosecution to satisfy the jury, from the entire evidence in any case, beyond a reasonable doubt, that the accused is guilty of the offence charged. Therefore if, after considering the evidence in support of the alibi, in connection with all the other facts and circumstances proven in this case, you shall be satisfied, beyond a reasonable doubt, that said prisoners are guilty, you may, notwithstanding their evidence of an alibi, convict them ; otherwise you should acquit.

And now, gentlemen of the jury, it becomes your duty subject

to the law as we have given it to you, to determine from the entire evidence before you, whether or not the prisoners are the persons who, as principles or accomplices, caused the death of Benson, and within this County.

That the prisoners at the bar are the guilty persons, the prosecutions contends is the only just and rational inference to be drawn from a careful and intelligent consideration of all the facts and circumstances proved by the credible and reliable witnesses in the case. On the other hand the prisoners deny that they are the guilty parties, and contend that no such inference can be drawn from such consideration of all the facts and circumstances so proved. It is upon these opposing contentions that you have to sit in judgment and reach a conclusion before you render your verdict.

In considering the testimony, if you find that any of the witnesses contradict each other, you must decide between them after viewing the testimony of each in connection with all the facts and circumstances proved in the case, and after considering the comparative impartiality, qualifications and advantages of each for knowing and identifying the prisoners, and Benson and his alleged corpse, etc., and for knowing, observing, comprehending and recollecting the circumstances and matters concerning which they have testified. Where there is a conflict of testimony you must reconcile it if possible. If you cannot do so, then you may reject so much thereof as you deem the less trustworthy and accept that portion which you consider the more so, after due deliberation upon all the evidence submitted from the witness stand, and from no other source.

You are the judges of the facts and of the credit due to the respective witnesses, and it is your exclusive province, subject only to the law as explained to you by this court, to determine according to the evidence whether or not the prisoners have been proven, beyond a reasonable doubt, guilty of any offence under this indictment.

By reasonable doubt, as we have already explained, is not

meant a vague, speculative, whimsical, or merely possible doubt but such a doubt only as intelligent, reasonable and impartial men may honestly entertain after a careful examination and conscientious consideration of all the evidence.

It only remains for us to say in conclusion, that if, after such examination and consideration of all the evidence submitted on both sides in this case, you shall be satisfied, beyond such a reasonable doubt, that the prisoners are the persons who, as principals or accomplices, caused the death of Benson, as alleged in this indictment, and within this county, then you are further to determine, subject to the law as we have explained it to you, whether or not the prisoners are guilty of murder of the first degree, or murder of the second degree, or of any kind of felonious homicide, and to render your verdict accordingly. But if, after such examination and consideration of said evidence, you shall not be so satisfied that the prisoners are guilty of murder of either degree, or of any kind of felonious homicide, then you should acquit them and render a verdict of not guilty. Any one or more of the prisoners may be convicted, and the others acquitted under this indictment, according as the evidence may justify and warrant it, in the judgment of the jury.

With these instructions for your aid and guidance in the discharge of your solemn and responsible duty, the case is now submitted to you for your verdict.

The jury, after five hours deliberation, returned with the following verdict:

"Guilty of murder of the second degree, as to George Henry Hutt, James Johnson and Daniel Miller, alias Daniel Redden; not guilty, as to Julia Hutt."